IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVLEEN SALEM, an individual,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>HERITAGE SQUARE INC., doing business as HERITAGE HOUSE GALLERIES, a California corporation; PATRICK TUNNEY, an individual; JOE CAPUTO, an individual;<br><br>　　　　Defendants.<br>　　　　　　　　　　　　　　　　　　　　／ | No. C 06-04691 WHA<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

In this action for sexual harassment, retaliation, wrongful termination in violation of public policy, and intentional infliction of emotional distress, defendants move for summary judgment on all claims. In the alternative, defendants move for partial summary judgment or an order specifying facts without significant controversy. Defendants have failed to eliminate all triable issues of fact in plaintiff's hostile work-environment claim. Similarly, there remains a factual dispute as to when plaintiff's employment ended and whether she was terminated. Also, defendants have failed to eliminate all triable issues of fact in plaintiff's claims for wrongful termination in violation of public policy and intentional infliction of emotional distress. Accordingly, defendants' motion for summary judgment is **DENIED**.

**STATEMENT**

Defendant Heritage Square, Inc., doing business as Heritage House Galleries, is a California corporation in the business of selling retail home furniture and furnishings. Its headquarters and retail operations are located in Concord, California. Plaintiff Evleen Salem began work at Heritage House as a designer, or furniture salesperson, in April 2004 (Sturmer Decl. Exh. 1, 11:24–12:1). Defendant Patrick Tunney also worked as a designer at Heritage House Galleries.

Heritage Square compensated its designers on a straight commission basis with a guaranteed minimum salary for the first few months of work (Miller Decl. Exh. A, 40:17–41:2). The commission system necessitated an orderly procedure for serving new customers coming into the store. At Heritage Square, these procedures were referred to as the "floor rules," and they were described in the employee handbook (*id*. at 32:15–35:14, Salem Dep. Exhs 6–8). The floor rules were referred to as an "up" system. In the morning, designers would sign in based on the order in which they arrived. For customers who walked into the store without having made an appointment to see a particular designer, designers would help those customers in the order of the designers' arrival (*id*. at Exh. E, 38:12–39:12). Taking a walk-in customer was called having an "up" according to the floor rules. After a designer had an up, he or she could not serve an arriving customer until the other designers with later ups had served arriving customer or were not available to do so (*ibid*.). The floor rules forbade designers from interfering or interrupting another designer while they were serving a customer. The written floor rules also controlled how Heritage Square employees greeted new, incoming customers.

In addition, designers saw customers by appointment to forge relationships with repeat customers. Also, a designer who was originally serving a certain customer could drop that customer if the designer deemed them unlikely to make a purchase. Another designer could then pick up that customer, and if the customer made a purchase, the second designer would get the commission (*id*. at Exh. A, 171:21–174:1). Because of the commission system at Heritage Square, sales work was highly competitive and the floor rules were necessary to the orderly service of customers. Disputes between employees over the adherence to and the operation of

1  the floor rules were fairly common. Management would sometimes have to intervene to
2  interpret the floor rules or settle disputes (*id*. at Exh. E, 73:19–75:3).

3                              *          *          *

4    Evleen Salem was born and raised in Jordan and educated in Egypt. Salem emigrated to
5  the United States and became a naturalized citizen in 1983 or 1984. Arabic was her first
6  language. (*id*. at Exh. A, 20:3–21). Her religion was Orthodox Catholic, and Heritage Square
7  allowed her to come in to work slightly later on Sundays so she could attend mass (*id*. at
8  10:24–11:9; 57:2–23). Salem began working at Heritage House Galleries in April 2004. At the
9  time she began work, she was given a copy of relevant employee policies, including the floor
10 rules and policies on absences (*id*. at Exh. A, 32:13–33:10). She acknowledged that she had
11 read and understood Heritage Square's policies and agreed to abide by them (*id*. at 32:19–33:9).

13   Plaintiff worked closely with defendant Patrick Tunney. Though he was one of the
14 more experienced designers at Heritage Square, he was not a manager or a supervisor and had
15 no authority to discipline or supervise other employees (*id*. at Exh. E, 14:12–14:25, John
16 Caputo Decl. ¶ 3). Salem alleged in her complaint that Tunney was a "de facto" supervisor
17 (Compl. ¶ 3). She has not, however, presented any facts that would show this to be the case.
18 Tunney and Salem had a number of disputes on the sales floor regarding the floor rules. Some
19 of these disputes involved finger-pointing and raised voices in front of customers. Plaintiff
20 testified that on more than one occasion, the disputes resulted in her telling Tunney to "go to
21 hell" (Miller Decl. Exh. A, 67:17–25; 68:22–69:14).

22   Salem testified that the first time she encountered Tunney, he complimented her on her
23 appearance and "gave [her] a look up and down, that I felt he undressed me with his eyes"
24 (Sturmer Decl. Exh. 1, 196:14–22). He also complimented her on her appearance on other
25 occasions and asked about her body language, occasionally telling her that she looked tense (*id*.
26 at 198:10–199:25). Salem testified that she was offended when Tunney complimented her but
27 not when similar comments came from other employees (*id*. at 202:5–203:11). She also
28 testified that he repeatedly brought up topics of a sexual nature when she was nearby. For

3

instance, when discussing a television show, she testified that he interjected personal anecdotes related to his own sexual experiences (*id.* at 219:24–220:13). On other occasions, he made sexual comments to other employees or groups of employees that plaintiff considered to be vulgar (*id.* at Exh. 2, 278:1–24; 302:1–23). For instance, Salem testified that in June or July of 2005, Debbie Henriquez, another designer, and Tunney were sitting around the up desk when a female customer entered the store wearing sweatpants with "Juicy" written on the seat. She testified that Tunney commented to Henriquez that he could not believe that a woman would wear such clothing. Henriquez and Tunney had a conversation about people at Henriquez's school wearing them. Tunney then said that "[i]f it was any juicier than that, I can put it in a cup and spoon it." Salem testified that she said that his remark was disgusting, and walked away (*id.* at 277:8–279:3).

Plaintiff testified that Tunney was giving her pointers on salesmanship and said that she should touch the furniture in front of customers. She testified that he commented "I sell to women a lot, and women love to be fondled" (*id.* at Exh. 1, 205:13–206:25). Tunney agreed in his own deposition that he suggested touching the furniture in front of customers, but denied that he used the word "fondle" and denied making the further comment about women (Miller Decl. Exh. E, 89:22–91:8). (This order, of course, must credit plaintiff's version for the purposes of summary judgment.) Plaintiff also testified that Tunney commented that a faucet in a catalog resembled male genitalia, but admitted that the conversation was actually with another salesperson, not her, and that no one ever actually showed the catalog to Salem (Sturmer Decl. Exh. 1, 225:18–226:25). Plaintiff also testified that Tunney commented on her physical appearance and that of a another salesperson, saying that their respective appearances could help them make sales (*id.* at Exh. 2, 286:23–290:20).

Both sides agree that at no time did Tunney ever make overt sexual advances toward her, touch her in an unwelcome manner, or suggest that she should sleep with him (*id.* at 203:19–204:6). Salem testified at her deposition, however, that the problem between herself and Tunney was as follows (*id.* at 233:3–234:11):

> I think he was attracted to me and I think he would have loved to
> have had a relationship with me . . . . I turned him down very

4

> gently in so many different ways. I was not interested in gaining his design clients, as he many times offered, as he offered me his cell phone to come to the showroom earlier. I declined all of this because I did not feel comfortable.
>
> He stated to me many times over how much he admires me, how much he respects me. But yet within the same token there was that hostile of you just don't understand, you don't have the capability to understand. You are just not a good salesperson.
>
> So it was all mixed feelings that he did not get what I believe he wanted from me, therefore he turned this into being hostile.

\*          \*          \*

Plaintiff also alleges that she was discriminated against on the basis of her ethnicity and her purported religion, *i.e.*, that some of her colleagues, specifically Tunney, believed her to be a Muslim. Plaintiff and defendants agree that Tunney asked her for assistance in pronouncing the names of Middle Eastern customers (Sturmer Decl. Exh. 1, 106:6–108:11). Salem testified that such requests from Tunney made her feel as if she did not belong in this country (*id*. at 112:10–113:21). Once, during an argument, Salem testified that Tunney told her to "read the floor rules, if you know how to read" (*id*. at 156:7–157:19). She also stated that he made comments during arguments on her inability to assimilate and asked whether she was a citizen and about her ability to speak English (*id*. at 99:8–101:23). On another occasion, Salem was on the sales floor, and began discussing Middle Eastern politics with one of her customers. Tunney took note, walked by, and commented under his breath that the conversation was not appropriate (*id*. at 120:6–122:20). Tunney also expressed his disapproval when Salem spoke in Arabic with customers, calling such behavior unprofessional or inappropriate (*id*. at 117:14–118:19).

Tunney also made a comment on some kind of headdress, which Salem identified as Middle Eastern but stated that such clothing is worn by many cultures, worn in the store by one of his customers (*id*. at 133:8–134:22). Salem testified that he asked her questions about her religion, church attendance, and practices related to her religion (*id*. at 134:23–135:7). Salem also related an incident in which Tunney and other employees made some comments related to the 9/11 terrorist attacks in which they joked that a former coworker might have appeared in

5

1  news of the attack. Tunney asked her whether she knew how people could engage in such
2  attacks, which question she believed to be racial harassment (*id*. at 103:9–106:5).

3        At some point, Salem had a conversation with a woman who had formerly worked with
4  Tunney at another furniture store. She said that Tunney had previously targeted a female
5  employee where he worked, and suggested that Tunney would keep after his target until she
6  quit. Salem recalled no further contact with the woman who told her that story, and Salem
7  could not identify any of female employees that had been repeatedly targeted (*id*. at Exh. 2,
8  305:18–306:22). Tunney testified that at least once, defendant John Caputo asked him to ease
9  off of Salem. Tunney also testified that Debbie Henriquez, a co-worker, also asked him the
10 same thing (*id*. at Exh. 6, 79:23–80:14; 81:22–82:19). It is unclear from the deposition
11 testimony whether these requests from Caputo and Henriquez were in response to fights
12 between Tunney and Salem, or his purported comments based on gender, religion, or ethnicity.

13       Salem and Tunney had another dispute on July 17, 2005, regarding customers and the
14 operation of floor rules. She testified that while she was sitting at the up desk, Tunney came
15 over and began to yell at her. After the altercation, she reported being distressed and emotional,
16 and later she reported having heart palpitations, anxiety, headaches, stomach problems, and
17 difficulty breathing (*id*. at Exh.1, 141:18–142:6; 146:7–18). Salem discussed the incident with
18 John Caputo. He testified that after the incident, she had told him that she was thinking of
19 quitting her job at Heritage Square. He told her that he would speak to Tunney regarding his
20 actions toward her. It is not clear that John Caputo understood that Salem believed Tunney's
21 behavior to be sexual harassment or ethnic discrimination (*id*. at Exh. 3, 189:3–192:15). John
22 Caputo also testified that he hired his brother, Joe Caputo, as a supervisor, to provide a support
23 mechanism for the sales staff (*id*. at 189:21–190:5). John Caputo testified that he had little
24 experience in handling matters of sexual harassment (*id*. at 226:18–25).

25       John Caputo wrote a letter to Salem after the incident on July 17, 2005 (*id*. at
26 282:10–283:2; Dep. Exh. 12). In it, he described the altercation between Salem and Tunney.
27 The letter reported that Salem referred to the altercation between herself and Tunney as
28 "harassment." According to the letter, Salem's husband later came in and spoke to John Caputo

6

1  regarding the events. The letter stated that both Salem and her husband referred to Tunney's
2  actions as "harassment" and relayed that she asked Caputo to take disciplinary action against
3  Tunney for the incident. Caputo wrote that he told her that she could file a complaint with the
4  EEOC if she so desired (*ibid.*).

5  John Caputo testified that he told Joe Caputo of the altercations between Tunney and
6  Salem (*id.* at 198:1–8). Joe Caputo testified in his deposition, however, that John Caputo only
7  gave him basic, general information about the sales staff at Heritage Square (*id.* at Exh. 5,
8  22:15–25; 24:13–18). He testified that he was never told of any of Salem's allegations of
9  harassment by Tunney (*id.* at 84:21–85:14). Joe Caputo testified that he did not notice any
10 problems between Tunney and Salem through the month of August up until September 15 (*id.* at
11 67:16–68:2).

12 Salem's final day of work was October 9, 2005. Tunney and Salem had a dispute over a
13 customer that Salem felt he had greeted out of turn (Miller Decl. Exh. A, 178:10–179:19). She
14 brought the dispute to the attention of Joe Caputo, the manager on duty at the time (*id.* at
15 180:6–14). Salem testified in her deposition that Joe Caputo yelled at her and told her that she
16 was a troublemaker and that he had had enough from her (Sturmer Decl. Exh. 1,
17 180:18–181:12). Joe Caputo testified, however, that he asked her to go into his office to talk
18 about the dispute (Miller Decl. Exh. D, 101:23–102:10). He also testified that Salem refused to
19 discuss the matter with him and left the store (*id.* at 100:11–101:22). Salem testified that he
20 told her that if she left the office without explanation, she should not bother coming back to
21 work (Sturmer Decl. Exh. 1, 181:13–18). Joe Caputo testified that he wanted to warn her that
22 she should not leave without explaining the situation or lodging a complaint (*id.* at Exh. 5,
23 103:1–12). He also stated that he did not have the authority to hire or terminate employees (*id.*
24 at 103:22–104:1). After the incident, Joe Caputo called John Caputo and relayed what had
25 occurred (*id.* at 101:23–102:10).

26 Salem admitted in her deposition that she left work early on the day of October 9, 2005,
27 and that she did not have authorization to do so (Miller Decl. Exh. A, 186:7–11). She did not
28 report for work or call in for October 11 through October 13, the next three days that she was

7

scheduled to work (*id*. at 191:3–22). According to the Heritage Square employee handbook, an employee on non-authorized leave who did not report to work or call within two working days would be considered terminated effective on the third day he or she was absent (*id*. at Exh. 6, p. 73).

Salem testified that she believed that Joe Caputo had terminated her on October 9, 2005 (*id*. at 418:15–419:5). She called John Caputo on October 12, and he informed her that a letter of termination was in the mail (*id*. at 189:2–191:2). He told her that her failure to come to work or call in meant that she was terminated.

Plaintiff filed this action on August 1, 2006. She alleges claims for (1) employment discrimination under Title VII based on gender, purported religion, and ethnicity against all defendants, (2) sexual harassment in violation of California's Fair Employment and Housing Act against all defendants, (3) retaliation against Heritage Square, (4) wrongful termination in violation of public policy against Heritage Square, and (5) intentional infliction of emotional distress against all defendants. This motion for summary judgment was filed on July 18, 2007. Trial is set to begin on October 22, 2007.

**ANALYSIS**

Summary judgment should be granted where the pleadings, discovery, and affidavits show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023–24 (9th Cir. 2004). Once the moving party has met its initial burden, the nonmoving party must "designate specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citation omitted).

In the Ninth Circuit, "there is a high standard for the granting of summary judgment in employment discrimination cases." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). "'[W]e require very little evidence to survive summary judgment' in a discrimination case, because the ultimate question is one that can only be resolved through a 'searching inquiry' – one that is most appropriately conducted by the factfinder, upon a full record.'" *Ibid.* (quoting *Lam v. University of Hawaii*, 40 F.3d 1551, 1563 (9th Cir. 1994)).

Defendants have moved for summary judgment as to all of plaintiff's claims. Plaintiff argues that there remain triable issues of fact as to whether she was subjected to a hostile environment based on gender, ethnicity, and purported religion, whether the termination of her employment was based on retaliation, and whether she was wrongfully terminated in violation of public policy against sexual, ethnic, and religious harassment.

As an initial matter, both plaintiff and defendants have filed objections to evidence presented in briefing this motion. To the extent those objections bear on the outcome of this motion, they will be dealt with as they arise.

**1. TITLE VII CLAIMS.**

Plaintiff's first claim alleges that she was subjected to a hostile work environment based on gender, national origin, and purported religion in violation of Title VII. Her second claim alleges that she was subjected to severe and pervasive sexual harassment in violation of California's Fair Housing and Employment Act.

An employer is liable for conduct giving rise to a hostile work environment if the employee can show: (1) she was subjected to verbal or physical conduct of a harassing nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an intimidating, hostile, offensive, or abusive working environment. *See Pavon v. Swift Transp. Co.*, 192 F.3d 902, 908 (9th Cir. 1999). The severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Factors that may be considered "may include the frequency of the discriminatory conduct; its severity; whether it is physically

9

1  threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes
2  with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

### A. Sexual Harassment.

Plaintiff presents evidence that she was subjected to verbal remarks and conduct based on her gender, ethnic background, and her purported religion. As to sexual harassment, she notes that Tunney was "constantly" giving her compliments on her appearance and asked her on one occasion if she was happy in her marriage. She also contends that he brought sexual connotations to normal workplace conversations with *other* employees that she could overhear. Although these were not sexual references, he would also have serious disagreements over the operation of the floor rules with her, attempt to intimidate her, yell at her, and point his finger in her face. He would mock her in front of colleagues. Defendants respond by pointing out that Tunney never made any sexual advances and never touched her in an unwelcome way. Plaintiff agrees. She argues, however, that Tunney's conduct was sufficient to create a triable issue of fact that the hostile environment was so severe and pervasive as to alter the terms and conditions of employment.

Defendants contend that a reasonable person in plaintiff's position would not have considered Tunney's actions to have altered the terms of her employment. The standards for a hostile work-environment claim are not to be interpreted as a code of workplace civility; complaints based on "the ordinary tribulations of the workplace, such as the *sporadic* use of abusive language, gender-related jokes, and occasional teasing" are not actionable. *Farragher v. City of Boca Raton*, 775, 788 (1998) (emphasis added). Defendants present evidence that Tunney and Salem had an antagonistic working relationship which plaintiff does not deny given that they had several arguments over customers and the operation of the floor rules. Moreover, defendants contend that the incidents she did identify in her deposition were merely isolated instances of conduct that did not rise to the level of creating a hostile work environment.

This order now turns to whether the conduct was severe and pervasive enough from both an objective and subjective standpoint to alter the terms and conditions of Salem's employment. It seems clear from Salem's testimony that from a subjective standpoint, she believed that the

1 terms and conditions of her employment were altered, or so a reasonable jury could conclude.

2 Turning to the objective aspect, Salem testified that she was subjected to the following conduct:

- Tunney repeatedly complimented her on her appearance and body language;

- Tunney continuously brought up subjects of a sexual nature in conversations with other employees while Salem was within earshot;

- Tunney related personal anecdotes of a sexual nature when discussing a television show;

- Tunney told plaintiff that "women love to be fondled" when giving her advice on selling furniture;

- Tunney showed a faucet in a catalog to other employees and commented that it looked like male genitalia, without showing the picture to plaintiff;

- He made comments on the appearance of a female customer wearing sweatpants bearing the slogan "Juicy" on the rear.

Plaintiff also argues that Tunney's comments and actions, including arguments they had over customers and the operation of the floor rules, that did not directly implicate sex or her gender were nonetheless motivated by hostility based on her gender. "[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale*, 523 U.S. at 80. Plaintiff admits that she and Tunney had an antagonistic working relationship, but argues that his hostility toward her was motivated her sex. Plaintiff cites *Hong v. Right Management Consultants, Inc.*, 2006 WL 335291, *4 (N.D. Cal. 2006) (Hamilton, J.), for the proposition that conduct need not be sexual in nature, but there still must be a sufficient showing that the conduct was motivated by gender. In *Hong*, the plaintiff established based on her own testimony and the testimony of others that she was treated differently and was subjected to different working conditions because of her gender, even though much of the conduct of which she complained did not directly implicate her gender. Here, particularly coupled with Tunney's comments, a reasonable trier of fact could conclude that his conduct was motivated by his hostility toward plaintiff because of her gender.

Under the law in the Ninth Circuit, a single, fairly mild incident of sexual harassment is not sufficient to sustain a hostile work-environment claim. *See Kortan v. California Youth*

11

*Auth.*, 217 F.3d 1104, 1111 (9th Cir. 2000) (holding that summary judgment was proper for defendants where a supervisor had referred to a former female superintendent using derogatory names in front of plaintiff on an isolated occasion). Here, however, the number and frequency of incidents to which plaintiff testified is sufficiently greater to require a jury trial.

### B. Ethnic and Religious Discrimination.

Plaintiff also claims that she was subjected to a hostile work environment based on her ethnicity and her purported religion — although Salem was an Orthodox Catholic, she alleges that she was discriminated against because her coworkers, including Tunney, believed her to be a Muslim.

Salem presents evidence that Tunney would "repeatedly" ask her how to pronounce Middle Eastern names. When Salem and Tunney had arguments regarding the floor rules, he would sometimes question her language skills and her ability to read. Tunney told her that speaking Arabic and discussing Middle Eastern politics with customers was inappropriate. Tunney and other employees made comments and jokes about the 9/11 terror attacks and commented on a customer's wearing some type of headdress or head scarf which plaintiff did not identify.

Salem also argues that there is a triable issue of fact as to whether and when Tunney was aware that she was a Catholic, not a Muslim. She points out that she had a conversation with Tunney about her church attendance on Sundays some time between February and April of 2005. Thereafter, he asked her if, because of her religion, she had to fast on certain days or eat certain things. Salem contends that this meant that he was making a comment on her purported religion. Viewing the facts in the light most favorable to the plaintiff, it is still unclear that Tunney was making a comment regarding her religion. Putting these comments together with others, however, defendants have not eliminated all triable issues of fact as to whether she was subjected to a hostile work environment based on her ethnicity and religion.

Defendants contend that even considering the facts in the light most favorable to plaintiff, there is no triable issue of fact as to whether she was subjected to discrimination based on her ethnicity or religion. Salem did testify that the comments made her feel "less American"

12

and as if she did not belong in the country. Again, defendant argues that the incidents plaintiff identifies appear to be isolated and are not sufficient to rise to the level of severe or pervasive harassment. Similarly, in *Manatt v. Bank of America*, 339 F.3d 792, 798–99 (9th Cir. 2003), the Ninth Circuit held that isolated, racially offensive comments coupled with an incident of teasing the plaintiff for her accent and pronunciation did not constitute a objectively hostile work environment. Here, however, plaintiff testified that Tunney demeaned her ability to read and understand English on several occasions. Defendants have failed to show, particularly in conjunction with other remarks Tunney allegedly made regarding plaintiff's sex, that she was not subjected to a hostile work environment.

Plaintiff argues in her opposition that in determining whether she was subjected to a hostile environment, all facts relevant to her claims of gender, ethnic, and religious discrimination should be considered together. *Lam v. University of Hawaii*, 40 F.3d 1551, 1561 (9th Cir. 1994). Defendants argue that this action is distinguishable from *Lam* because it dealt with discrimination in hiring decisions, not a hostile work-environment claim. This distinction, although valid, does not necessarily demand that Salem's claims of gender, ethnic, and religious discrimination should be considered separately. At any event, plaintiff has shown that there remains a triable issue of fact regarding whether she was subjected to a hostile work environment based on sex, religion and ethnicity. Plaintiff's case is arguably weak — she admits that Tunney never solicited sex from her or touched her in appropriate manner. Still, defendants' motion for summary judgment as to plaintiff's discrimination claims under Title VII and FEHA must be **DENIED**.

## 2. RETALIATION CLAIMS UNDER FEHA.

"Lawsuits claiming retaliatory employment termination in violation of CFEHA are analogous to federal Title VII claims, and are evaluated under federal law interpreting Title VII cases." *Flait v. North American Watch Co.*, 3 Cal. App. 4th 767, 476 (1992). To establish a prima facie case of retaliation under FEHA, the plaintiff must show: (1) that he or she engaged in a "protected activity;" (2) that the employer subjected the employee to an adverse employment action; and (3) a causal link that existed between the protected activity and the

13

1  employer's action. *Yanowitz v. L'Oreal, USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). "Once an
2  employee establishes a prima facie case, the employer is required to offer a legitimate,
3  nonretaliatory reason for the adverse employment action." *Ibid.* If the employer does so "the
4  presumption of relation 'drops out of the picture,' and the burden shifts back to the employee to
5  prove intentional retaliation." *Ibid.*

### A. Prima Facie Case.

Plaintiff has the burden to present evidence that she engaged in a protected activity. Salem testified in her deposition that she complained repeatedly about Tunney's harassment to John and Joe Caputo, who failed to take action. She estimated that she complained to them about Tunney's behavior approximately 20 to 30 times, although she did not point out when any of those complaints occurred. She also points out that in John Caputo's letter to her following the incident on July 17, 2005, he underlined the word "harassment" in two places.

In response, defendants point out that on October 9, 2005, Salem's final day of work, she testified that she had complained to Joe Caputo because of a dispute with Tunney over adherence to the floor rules and interrupting a salesperson while they were with a customer, not because of harassment. Still, the fact remains that Salem testified to complaining about harassment to management on other occasions. Viewing the facts in the light most favorable to plaintiff, she has created a triable issue of fact that she complained about harassment and engaged in protected activity.

Turning to the second element, plaintiff argues that she was fired on October 9, 2005, in retaliation for complaining about harassment. Defendants contend that Salem walked off the job early and failed to call in for three days in violation of store policy. Heritage Square also argues that Salem knew the consequences of leaving work early without an excuse because she was aware of Heritage Square's policies. Whether or not she intended to quit, according to defendants, she was ultimately terminated for her failure to follow company policy. Viewing the facts in the light most favorable to plaintiff, a reasonable trier of fact could determine that she had suffered an adverse employment action.

14

Finally, turning to the third element, plaintiff argues that she was terminated for complaining about harassment to management. Plaintiff points out that Tunney was one of Heritage Square's highest-earning salespersons. Rather than responding to her complaints about harassment, so the argument goes, defendants instead chose to circle the wagons around their highest-earning salesperson. Moreover, she argues that her alleged termination was sufficiently close in time to her complaints about harassment to show retaliation. Here, viewing the facts in the light most favorable to plaintiff, she has presented a *prima facie* case that she was retaliated against.

### B.     Legitimate, Non-Discriminatory Reason.

The burden now shifts to defendants to present a legitimate, non-discriminatory reason for their actions. It is undisputed that Salem left early on her final day of work, that Joe Caputo warned her against leaving without explaining the situation, and that she did not show up for her next two shifts or call in to explain her absences. It is also undisputed that Heritage Square's attendance policy was explained in the employee manual, a copy of which Salem received on beginning work. Accordingly, defendants have presented evidence that they had a legitimate, non-discriminatory reason for terminating Salem.

### C.     Pretext.

"[A] plaintiff at the pretext stage must produce evidence in addition to that which was sufficient for her prima facie case in order to rebut the defendant's showing." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). "When plaintiff offers direct evidence of discriminatory motive, a triable issue of as to the actual motivation of the employer is created even if the evidence is not substantial." *Id*. at 1221. Plaintiff can also prove pretext "indirectly, by showing that the employer's proffered explanation is 'unworthy of credence because it is internally inconsistent or otherwise not believable.'" *Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003) (internal citation omitted). When at the summary-judgment stage, "one draws all permissible inferences in favor of the nonmoving party." *Id*. at 1194.

15

Plaintiff does not present direct evidence of a discriminatory motive in terminating her employment. She does, however, testify that to her knowledge, John Caputo had never fired anyone for failure to call in for work, at least at that store. She also argues that the letter sent by John Caputo on October 12, 2005, informing her of her termination is evidence of pretext. The evidence that she presents of pretext is admittedly slim, however, a reasonable trier of fact could still conclude that Heritage Square's reasons for terminating her were pretextual. Accordingly, there still remain triable issues of fact on plaintiff's retaliation claim, and defendants' motion for summary judgment is **DENIED**.

### 3. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY.

"Apart from the terms of an express or implied employment contract, an employer has no right to terminate employment for a reason that contravenes fundamental public policy as expressed in a constitutional or statutory provision." *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1252 (1994). An employee actually or constructively discharged in violation of a public policy may have an action against the employer. *Ibid*. For a policy to support a claim for wrongful termination in violation of public policy, it must be: (1) delineated in either constitutional or statutory provision; (2) public in the sense that it serves the benefit of the public, rather than only the individual; (3) well-established at the time of discharge; and (4) substantial and fundamental. *Stevenson v. Superior Court*, 16 Cal. 4th 880, 901 (1997).

The public policy in opposing gender, ethnic, and religious discrimination is well-established in both California and federal law, and certainly benefits the public. Much as plaintiff has demonstrated that there are triable issues of fact as to her claim for retaliation, there are also triable issues of fact as to whether plaintiff was terminated for complaining to management about harassment based on her gender, ethnicity, and religion. Defendants' motion for summary judgment is **DENIED** as to this claim.

### 4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND PUNITIVE DAMAGES.

The elements of the tort of intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or the reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering or extreme

1  emotional distress; and (3) actual and proximate causation of the emotional distress by the
2  defendant's outrageous conduct. *KOVR-TV, Inc. v. Superior Court*, 31 Cal. 4th 1023, 1028
3  (1995). The first element sets a high standard. "Conduct to be outrageous must be so extreme
4  as to exceed all bounds of that usually tolerated in a civilized community." *Ibid*.

5  Defendants first argue that plaintiff cannot maintain this claim because she has not
6  presented any evidence that she was harassed or retaliated against as a matter of law. As
7  described previously in this order, plaintiff has shown that there remain triable issues of fact on
8  those claims. Moreover, Tunney had several heated arguments with her over the floor rules
9  during which he yelled, pointed a finger at her, slammed a notebook down on her desk, and
10 asked if she could read. These incidents admittedly came during arguments, but viewing the
11 facts in the light most favorable to Salem, a reasonable jury could conclude that they exceeded
12 the bounds of conduct tolerated in a civilized society. A reasonable jury could also conclude
13 that Tunney made such statements with the intent of causing plaintiff emotional distress.
14 Accordingly, defendants' motion for summary judgment as to plaintiff's claim for intentional
15 infliction of emotional distress is **DENIED**.

16 As to plaintiff's claim for punitive damages, defendants contend that plaintiff cannot
17 show that she is entitled to punitive damages. A plaintiff is entitled to punitive damages if he or
18 she can show by clear and convincing evidence that the defendants were guilty of malice, fraud
19 or oppression. Cal. Civ. Code § 3294. Plaintiff has shown that there remain triable issues of
20 fact that she either was subjected to a hostile work environment or was retaliated against for
21 complaining of harassment. In turn, whether defendants were guilty of malice, fraud, or
22 oppression is likewise a question for the jury. Accordingly, defendants' motion for summary
23 judgment as to Salem's claim for punitive damages is **DENIED**.

## CONCLUSION

25 For all of the above-stated reasons, defendants' motion for summary judgment is
26 **DENIED**.

27 A final caveat must be added. After denying a defense summary judgment motion, the
28 Court has occasionally found that the trial record falls short of the summary judgment record

17

and a Rule 50 motion is warranted.  Sometimes the plaintiff refuses to go as far at trial as he or she did in a lawyer-prepared declaration.  Sometimes evidentiary objections make a difference. Where, as here, the overall case is borderline, the risk of such an outcome is heightened. Counsel should not take anything for granted and both sides should be mindful of Rule 50.

**IT IS SO ORDERED.**

Dated:  September 4, 2007.


_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE